UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

FRANK GARCIA,                                              No. 6:19-cv-06047-CJS
                                                           DECISION AND ORDER
                                    Petitioner,

        -vs-

JOSEPH NOETH, Superintendent, Attica
Correctional Facility,

                                    Respondent.

_____

### APPEARANCES

For Petitioner:                     Frank Garcia, *Pro Se*
                                    DIN 09B2727
                                    Attica Correctional Facility
                                    Box 149
                                    Attica, New York 14011

For RespondenTr.                    James Foster Gibbons,
                                    Assistant Attorney General
                                    Office of the New York State Attorney General
                                    28 Liberty Street – 14th Floor
                                    New York, New York 10005

### INTRODUCTION

Frank Garcia ("Petitioner") has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, ECF No. 1, asserting that the judgment of conviction entered against him on September 1, 2009, in New York State, Ontario County Court (Doran, J.), was unconstitutionally obtained. For the reasons that follow, the petition is dismissed.

**BACKGROUND**

**I.      Pre-Trial Proceedings**

The convictions at issue here stem from the fatal shooting of Kimberley Glatz ("Mrs. Glatz"), and her husband, Christopher Glatz ("Mr. Glatz"), at their home in Canandaigua, New York, in Ontario County, on February 14, 2009.[1]  After killing the Glatzes, Petitioner ordered Mrs. Glatz's children from a previous marriage, 15-year-old Haley Fonda and 13-year-old Danny Fonda, to stay in Danny's bedroom for twenty minutes; otherwise, Petitioner said, he would come back and kill them.

Petitioner was arrested a few hours afterwards in Rochester, New York.  At a line-up procedure conducted that evening, Haley identified Petitioner as the perpetrator, and pointed out a distinctive gold-and-diamond wedding band he had been wearing.  On February 23, 2009, an Ontario County grand jury indicted Petitioner on two counts of Murder in the First Degree (New York Penal Law ("P.L.") § 125.27(1)(a)(viii)), two counts of Murder in the Second Degree (*Id.* § 125.25(1)), and two counts of Kidnapping in the First Degree (*Id.* § 135.20).  (SR.0001-0003).[2]

---

[1]      The murders of the Glatzes occurred in the late morning to early afternoon of February 14, 2009. Mrs. Glatz was a former coworker of Petitioner's who had filed a complaint against him that led to his termination.  At about 5 a.m. that same day, Petitioner had shot and killed another former coworker, Mary Silliman, in the parking lot of Lakeside Health Systems in the Village of Brockport, New York, in Monroe County.  During that incident, Petitioner also shot two bystanders—Randall Norman, who died; and Audra Dillon, who was able to drive herself to the police department.  Petitioner was prosecuted by the Monroe County District Attorney's Office and convicted following a jury trial in Monroe County Court (Geraci, J.) on two counts of first-degree murder and one count of attempted first-degree murder.  On December 16, 2009, he was sentenced to life without parole on all counts.  On direct appeal, the Supreme Court, Appellate Division, Fourth Department, affirmed the convictions but remitted the case for resentencing on the attempted murder conviction.  *People v. Garcia*, 148 A.D.3d 1559, 1561–62, 51 N.Y.S.3d 281 (4th Dept.), *leave denied*, 30 N.Y.3d 980 (2017).

[2]      Numerals in parentheses preceded by "SR." refer to the Bates-stamped page numbers located in the bottom of each page of the state court records filed electronically by Respondent at ECF Nos. 11-2 and 11-3.

Petitioner moved to suppress various items of evidence, arguing, *inter alia*, that he was arrested without probable cause, the line-up procedure was unduly suggestive, his statements to police were involuntary, and the post-arrest buccal swab for a DNA sample was improperly obtained.  A suppression hearing was held on June 2, 2009, before then-Ontario County Court Judge Craig J. Doran (the "trial court").  In its June 19, 2009 written decision and order denying suppression (SR. 0011–0030), the trial court determined that the police had, at least, reasonable suspicion for Petitioner's initial detention and probable cause for his arrest.  (SR. 0028).  The trial court found that the minor differences in the physical characteristics of Petitioner and the line-up fillers were not sufficient to create a substantial likelihood that he would be singled out for identification, and the procedure was not unduly suggestive.  (SR. 0024).  The trial court concluded that the statements Petitioner made to the police investigator after invoking his right to counsel were spontaneous and not the result of police interrogation.  (SR. 0026–0027).  The fact that the police investigator misled Petitioner into believing he was not under suspicion did not create a substantial risk that Petitioner might falsely incriminate himself and therefore did not render his statements involuntary.  (SR. 0027).  The trial court found that even though Petitioner consented to providing a buccal swab at the time of his arrest, his consent was ineffectual since he earlier had invoked his right to counsel and his indelible right to an attorney had attached.  (SR. 0028–0029).  Nonetheless, the trial court agreed with the prosecutor that since the police would have been able to obtain a court order or warrant for a DNA sample, the buccal swab was admissible under the inevitable discovery doctrine.  (SR. 0029).

At a closed *Sandoval*/*Molineux*/*Ventimiglia* hearing[3] on August 3, 2009, the prosecutor indicated that he wished to introduce some evidence of the Monroe County homicides and ensuing investigation, arguing that they were inextricably intertwined with the Ontario County homicides, necessary to complete the narrative, and relevant to motive and identity.  (Tr. 55–61, 66–67).[4]   The prosecutor requested that the police witnesses be permitted to testify that they "were investigating homicides, two shootings, two fatal, one nonfatal in Monroe County, that occurred earlier in the day."  (Tr. 60). Defense counsel opposed the introduction of the Monroe County murders as unduly prejudicial. (Tr. 63–66).  The trial court reserved decision (Tr. 67) and subsequently ruled that the prosecutor should "instruct [his] witnesses that to the extent they need to explain why they were involved in the Monroe County matters, that [they can say] they were involved in[ ] investigations or an investigation relating to crimes in Monroe County involving firearms."  (Tr. 72).

---

[3]      *Sandoval*, *Molineux*, and *Ventimiglia* refer to three New York Court of Appeals cases—*People v. Sandoval*, 34 N.Y.2d 371 (1974); *People v. Molineux*, 168 N.Y. 264 (1901); and *People v. Ventimiglia*, 52 N.Y.2d 350 (1981), respectively.  "[D]iscussion of '*Sandoval*/*Molineux*/*Ventimiglia* rulings' is 'a short-hand reference to the New York procedure for determining in advance whether evidence of prior crimes is admissible for impeachment purposes in the event the defendant testifies (*Sandoval*), or prior crimes/uncharged criminal conduct is probative for the purpose of showing, e.g., (1) motive, (2) intent, (3) absence of mistake or accident, (4) common scheme or plan, or (5) identity, and whether that probative value outweighs the prejudicial effect (*Ventimiglia*/*Molineux*)."  *Olivo v. Graham*, No. 15CIV9938VBAEK, 2021 WL 3272080, at *2 n.4 (S.D.N.Y. Mar. 23, 2021), *report and recommendation adopted*, No. 15 CV 9938 (VB), 2021 WL 3271833 (S.D.N.Y. July 30, 2021) (quoting *Brown v. Walsh*, No. 9:06-cv-01130-JKS, 2009 WL 3165712, at *1 n.4 (N.D.N.Y. Sept. 28, 2009)).

[4]      Numerals in parentheses preceded by "Tr." refer to the actual pages of the trial transcript, which has been filed electronically by Respondent as part of ECF No. 11-4.

II.     **The Trial**

A.  **Summary of Relevant Testimony Presented by the Prosecution**

1.  **Petitioner's History with the Glatzes**

Robert Jones ("Jones"), the president and chief executive officer of Wesley Gardens, a skilled nursing facility in Rochester, testified that Mrs. Glatz and Petitioner were both employed at Wesley Gardens for a period of time.  Mrs. Glatz was a nurse; Petitioner was her supervisor.  (TR. 805-809).  On March 31, 2008, Mrs. Glatz filed a complaint against Petitioner with administrators and, as a result of that complaint, Petitioner was suspended immediately.  After Wesley Gardens substantiated Mrs. Glatz's allegations, they fired Petitioner.   In addition, Wesley Gardens paid Mrs. Glatz a settlement in the amount of $25,000 to compensate her for Petitioner's actions.

After being fired by Wesley Gardens, Petitioner found employment as a nursing supervisor with Lakeside Health Systems ("Lakeside").  James Cummings, a senior vice-president at Lakeside, testified that on February 4, 2009, an employee filed a complaint against Petitioner.  After an investigation, Lakeside terminated Petitioner by letter dated February 10, 2009.  (Tr. 823–824).  Petitioner's wife, Margeann Garcia ("Mrs. Garcia"), testified that this letter was received at their house on February 13, 2009.  (Tr. 908).

Kathryn Haskins ("Haskins") testified that she and Petitioner became friends while working together at Wesley Gardens; they communicated frequently and went out together socially.  Haskins testified that Petitioner always carried two handguns at work— one on his waist and one on his ankle.  After he was fired from Wesley Gardens, Petitioner told Haskins how he much he hated Mrs. Glatz for filing the complaint that ultimately caused his termination.  (Tr. 976–977).  Petitioner vowed to Haskins that Mrs. Glatz was

"gonna get hers," and he also "made threats towards her and her family."  (Tr. 977–978; 994–995).  At some point prior to February 14, 2009, Petitioner sent an email to Haskins stating that he was going to shoot Mrs. Glatz and the rest of her family "execution style." (Tr. 981).  In a subsequent email, Petitioner advised Haskins that he was going to kill the adults but not the children.  (Tr. 981–982).  In another email prior to the shootings, Petitioner commented that he had been "reconning" the Glatzes and attached a link to a Google Maps photograph of their house on Middle Cheshire Road.  (Tr. 978–982). Claiming she did not believe he was serious, Haskins just told him to "stop acting crazy" and did not contact the police at the time.  (Tr. 982).  Prior to turning her computer over to police on the day after the murders, Haskins deleted all of her emails with Petitioner. (Tr. 982–983).

### 2.  The Murders

On February 14, 2009, sometime between 9 a.m. and 10 a.m.,[5] Haley was upstairs at the family's house when she heard yelling coming from downstairs; it was a male voice she did not recognize.  (Tr. 598–599).  At her mother's request, Haley went downstairs to find a strange man standing in their living room, waving a black gun around.  (Tr. 600, 602, 604).  Haley said the man was bald and dressed in a dark green fleece with grayish-tan markings on it.  (Tr. 602).  He also was wearing  a gold wedding band with diamonds on it which she saw up close.  (Tr. 603–604).  Haley identified the man in court as Petitioner and said that her mother and stepfather were calling the man "Frank" or "Frankie".  (Tr. 601, 605).  Haley described Petitioner as "really emotional and upset and

---

[5]      Stefanie Glatz, Mr. Glatz's daughter, testified that she called her father's cell phone number (585-727-9641) at 9:15 am. on the morning of February 14, 2009.  Mrs. Glatz answered.  While Mrs. Glatz was looking for Mr. Glatz, she and Stefanie chatted for several minutes.  At about 9:24 a.m., Mrs. Glatz abruptly ended the call.  (Tr. 588–591).

. . . like enraged." (Tr. 606). Haley testified that Petitioner called her mother and stepfather "liars" because her mother had filed a complaint falsely accusing him of raping her mother. (Tr. 606–607). Haley recalled that Petitioner mentioned the rape complaint multiple times and was angry because, he said, it cost him his job. (Tr. 608). Throughout this time, Haley testified, Petitioner was yelling and waving his gun around and pointing it at her mother. (Tr. 608–609, 610–611).

Haley testified that she could still hear what was being said in the living room even when Petitioner made her and Danny go back to Danny's bedroom on the first floor and shut the door. (Tr. 613–614, 630). Haley said that Petitioner repeatedly demanded that her mother and stepfather pay $25,000 to his wife. (Tr. 615). When her stepfather asked if Petitioner would leave everybody alone if the money was delivered to his wife, Petitioner replied, "No, somebody is going to die." (Tr. 621–622). Haley also testified that Petitioner had her mother make a list of names and addresses of family members whom Petitioner vowed to harm if he did not receive the $25,000. (Tr. 622–624, 626–628). Haley saw the list while Petitioner was still at the house and testified she recognized the handwriting as her mother's. (Tr. 624–625). The list was on a piece of note paper with the logo from Quail Summit nursing home, where her stepfather worked as a manager. (Tr. 625–626). Haley also identified her stepfather's handwriting on a different piece of Quail Summit note paper. (Tr. 644–645).

Haley recalled that during the time Petitioner was at their house, he was smoking cigarettes. When he was finished with them, he put them out in a coffee mug and ordered Haley to wash the mug. (Tr. 649–650). Haley testified that she dumped the mug in the sink but did not know whether the cigarettes went down the drain. (Tr. 651–652). She

also noticed that Petitioner took the gum he was chewing out of his mouth and stuck the wad on the dining room table.[6]   (Tr. 652–653).   At one point, Petitioner ordered her stepfather to move his (Petitioner's) car, which was parked out the side of the road, into the driveway.  (Tr. 659).

Sometime after noon, Haley testified, Petitioner ordered her mother and stepfather to lie down separately on the living room couches.  (Tr. 630–631).  Mrs. Glatz begged Petitioner to just shoot her because she was the source of his troubles.  (Tr. 632).  Haley heard a gunshot and then a gasp of air and her mother crying.  (Tr. 633).  Petitioner came into Danny's bedroom and told them to stop crying and to stop plugging their ears because there was not going to be a big bang.  (Tr. 634).  Petitioner then left the room and Haley heard two more gunshots.  (Tr. 634–635).

Haley testified that Petitioner came back into Danny's room and accused them of coming from "a bad gene pool" and commented that if they were "liars" like their parents, he should kill them too.  (Tr. 635).  He pointed the gun at Danny and asked them whether they wanted to live or die.  (Tr. 636).  They said they wanted to live; Petitioner replied he had to think about it and left the room.  When he came back, he said that he was not going to kill them and ordered them to say, "Thank you, Frank," because "people usually don't spare kids."  (Tr. 637).  Petitioner then brought a clock into their room, and told the children that they could not leave the room for twenty minutes.  If they left early, he said, he would come back and kill them.  (Tr. 639–640).

---

[6]      The DNA profiles obtained from the cigarette butts and the chewed gum were compared to the DNA profile obtained from the buccal swab of Petitioner.  Forensic biologist Ellyn Colquhoun testified that the probability of randomly selecting an unrelated individual that would have the same DNA profile as the DNA profile found on the items tested and Petitioner was less than 1 in 118 quadrillion.  (Tr. 1515–1516).

Haley waited twenty minutes and then went into the living room where she found her mother and stepfather on the couches, motionless.  (Tr. 641).  After trying unsuccessfully to wake her mother, she looked for a phone but was unable to find one that worked.  Petitioner earlier had ordered her to bring him all the phones in the house; he put them in a pile and removed the chargers and the batteries from them.  (Tr. 641–642).  Haley ran to the next-door neighbors' house and used their phone to call her father, Christopher Fonda.  (Tr. 659–661). Haley testified that when her father arrived, he took one look at the scene in the living room, and said "Oh my God."  He picked up Danny, who has cerebral palsy and is wheelchair-bound, and they ran out to his truck where he called 911.  (Tr. 661–662).

Ontario County Deputy Sheriff Jeffrey Hoffman, the first officer to go into the house, first saw Mr. Glatz lying face down on the couch with three pillows on his back, two of which had bullet holes through them.  (Tr. 776).  Deputy Hoffman said that Mrs. Glatz was lying face down also; she had one pillow on the back of her head with one bullet hole through it.  (Tr. 776–777)

### 3.  Petitioner's Arrest

In keeping with the trial court's *Molineux* ruling (*see* Tr. 55–72), Monroe County Sheriff's Investigator Patrick Crough testified that on the morning of February 14, 2009, he was notified of an investigation into crimes in Monroe County that involved the use of a firearm.  (Tr. 1255).  During the early stages of that investigation, he and other law enforcement officers gathered information suggesting that Petitioner and another individual, Willie Irvine, were suspects.  (Tr. 1256–1257).

After obtaining Petitioner's cell phone number, Investigator Crough eventually was able to make telephone contact with him at about 11:30 a.m. that morning.  (Tr. 1257–1258).  To attempt to get Petitioner to meet with him, Investigator Crough employed a ruse, telling Petitioner that he was concerned that the other suspect posed a threat to the safety of Petitioner and his family.  (Tr. 1259–1260).  Petitioner told Investigator Crough that he would meet with him later and that he currently was at Charlotte Beach and Durand Beach in Monroe County, studying for a class.  (Tr. 1260–1261).  However, investigators were able to ascertain from Petitioner's wireless carrier that Petitioner's cell phone was "pinging" off cell towers in Naples, New York, in Ontario County, at 11:30 a.m. and again at 12:00 p.m. and 1:05 p.m.  (Tr. 1261–1264).  Investigator Crough testified that Durand Eastman Park is on the north border of Monroe County, while Naples is somewhere in the southern portion of Ontario County, so the distance spanned almost two counties.  (Tr. 1263).  Investigator Crough also learned that, at 1:10 p.m., Petitioner called his wife using Mr. Glatz's cell phone.  (Tr. 1264–1265, 1267).

At about 2:07 p.m., Investigator Crough received a call from Petitioner's known cell phone number; Petitioner agreed to meet him at a Tim Horton's restaurant at the intersection of Lake Avenue and West Ridge Road in the City of Rochester.  (Tr. 1268–1269).  Petitioner arrived at the Tim Horton's before Investigator Crough and was taken into custody by City of Rochester police officers at about 2:30 p.m.  (Tr. 1269–1271).  At the time of his arrest, Petitioner had a loaded .40 caliber Glock pistol, with additional ammunition in his pocket and in a magazine contained in a belt-holster.  (Tr. 867, 871, 888, 891, 1272–1274)

After being advised of and waiving his rights at 3:08 p.m., Petitioner agreed to speak with Investigator Crough.  (Tr. 1274–1277).  The conversation lasted until 4:25 p.m. (Tr. 1277).  In response to a question about the Ontario County crimes, Petitioner responded "that his job wasn't worth two labia's."  (Tr. 1278).  He also told Investigator Crough that "he would use a handgun to protect his family, not over a vagina."  (Tr. 1279). When asked if he had ever used a phone number beginning with "727", Petitioner at first denied it but then said he had called his wife from a pay phone when his own phone was not working; however, he would not tell Investigator Crough where the pay phone was located.  (Tr. 1281).  Petitioner denied having been in Canandaigua for years.  (Tr. 1283). Petitioner volunteered that a .40 caliber firearm was better than a .45 caliber because it "generates more knock-down power for one shot."  (Tr. 1281–1282).  Upon learning that his .40 caliber Glock pistol had been sent for ballistics testing, he commented that it was difficult to identify Glock pistols from rifling marks.  (Tr. 1281–1283).  According to Investigator Crough, Petitioner was somewhat cooperative at first but became "agitated" and "belligerent," complaining he was being treated like a "fucking criminal."  (Tr. 1284– 1285).  Due to Petitioner's increasingly hostile demeanor, Investigator Crough never asked him directly if he had committed the Canandaigua murders.  (Tr. 1285–1287).  At about 4:25 p.m., Petitioner terminated the interview, and Investigator Crough stopped questioning him.  (Tr. 1286).  Before leaving, Investigator Crough took possession of the gold wedding band with diamonds Petitioner was wearing.  (Tr. 1288–1289).

### 4. Additional Evidence Linking Petitioner to the Murders

#### a. Tire Prints

Ontario County Deputy Sheriff Mark Taylor testified that he assisted Ontario County Deputy Sheriff Peter Butler in making a dental-stone cast (People's Exhibit 25) of some tire impressions in the Glatzes' driveway that did not match any of the known vehicles there.  (Tr. 831–833).  Deputy Taylor transported the cast to the Monroe County Public Safety Laboratory ("Laboratory") for comparison with the tires on Petitioner's Ford Crown Victoria.  (Tr. 834–835).

Christina Atrouni, a trace evidence criminalist at the Laboratory, testified that the tire impressions in People's Exhibit 25 were made by a BLIZZAK WS-60 snow tire, which has a unique tread design among the more than 15,000 different tread designs on file. The same model tire was found on Petitioner's car.  Atrouni testified that the tread design of the cast impression and the tread design of the tire on Petitioner's car matched in all visible respects.  (Tr. 1465–1469).

#### b. Shoe Print

Ontario County Deputy Sheriff James Alexander discovered a partial shoeprint in the mud near the Glatzes' entrance door.  (TR. 958-959).  Atrouni compared Deputy Alexander's photograph of this shoeprint with the unique tread design on the shoes seized from Petitioner after his arrest.  (Tr. 1474).  Atrouni determined that the unique tread on the bottom of the shoe matched in all visible respects the unique tread pattern of the shoeprint in the mud.  Furthermore, the mud observed on the toe portion of the shoe corresponded precisely with that portion of the shoe that left the impression in the mud. (Tr. 1476–1481).

### c. Fingerprints

Deputy Butler testified that he analyzed a piece of notepaper with the Quail Summit logo on it that was recovered from the Glatzes' living room. (Tr. 1198–1202). After comparing it to a known sample of Petitioner's fingerprints, Deputy Butler positively identified a print from Petitioner's left thumb. (Tr. 1202, 1206–1208). Additional pieces of Quail Summit notepaper were found in the trunk of Petitioner's car. (Tr. 1230–1237). Deputy Butler positively identified two of Petitioner's fingerprints on that paper. (Tr. 1214–1215).

### d. Ballistics Evidence

Medical examiner Dr. Scott LaPoint determined that the two victims had been shot a total of three times—Mrs. Glatz once in the head, and Mr. Glatz twice in the back. (Tr. 1316–1317, 1321–1322). Ontario County Deputy Sheriff William Martin testified that three .40 caliber shell casings were recovered at the crime scene. (Tr. 1124–1133). Ballistics expert Eric Freemesser compared the shell casings recovered from the Glatzes' living room with shell casings from test firings of the. 40 caliber Glock pistol seized from Petitioner, and determined that all three shell casings recovered at the crime scene had been fired by Petitioner's pistol. (Tr. 1415–1423, 1425–1429).

### e. Analysis of the Computers Belonging to Petitioner and Haskins

Haskins, Petitioner's friend, turned her computer over to the police (Tr. 992), and the police obtained a warrant to seize Petitioner's laptop computer (Tr. 1069–1070). Computer forensics expert Greg Woodworth ("Woodworth") examined the computers and confirmed that Haskins and Petitioner engaged in numerous email conversations, although the substance of those conversations had been deleted. Woodworth also

determined that, on the evening of February 13, 2009, Petitioner used his computer to search the website "MapQuest.com" for directions to the Glatz house.  (Tr. 1333–1345).

### f.  The Letter Written by Petitioner

Monroe County Deputy Sheriff Robert Benedict testified that while executing the search warrant for Petitioner's vehicle, he recovered a two-page handwritten letter.  (Tr. 1071–1072).  The gist of the letter was Petitioner complaining about being victimized by "evil people," and asserting that he was being persecuted because he is a minority and a male in a female-dominated profession.  (Tr. 1646–1648).  Petitioner stated, among other things, that he was "accused of raping a female coworker at Wesley" and that "[t]hey believed her[,]" which "hurt [his] psyche tremendously" and "brought [him] down."  (Tr. 1646).  Petitioner's wife identified the handwriting as Petitioner's.  (Tr. 919–920).

### g.  Petitioner's Phone Call to Haskins from the Glatzes' House

Haskins testified that shortly before 10 a.m. on February 14, 2009, Petitioner called her from a cell phone later found to belong to the Glatzes and said he was at the Glatzes' house.  (Tr. 988–989, 1000–1001).  Haskin said she did not believe him, so he put Mrs. Glatz on the phone.  (Tr. 989, 1007).  After Mrs. Glatz said, "This is Kimberley," there was silence; Haskins asked her to put Petitioner back on the phone.  (Tr. 989–990, 1006).  He informed Haskins that he was there "to clear the air after being let go" from Wesley [Gardens] because it "hurt his ego to lose his job from there."  (Tr. 990).  Haskins asked Petitioner if it was "strange" being at their house so early in the morning on Valentine's day, but he did not really make any response.  (Tr. 991, 1006).  That was the extent of their conversation, and Haskins did not contact law enforcement until she heard about the murders on the news the next day.  (Tr. 991–993).

### h.  Petitioner's Actions Before and After the Murders

Mrs. Garcia testified that Petitioner left their house at 9 p.m. on February 13, 2009, but he never returned.  (Tr. 912–913).  She had about five phone conversations with him between the time he left on February 13th and the early afternoon of February 14th.  (Tr. 913).  When she spoke with him, he was "[u]pset."  (Tr. 913).  Mrs. Garcia recalled that she received at least one call from Petitioner using a phone number that started with a "7."  (Tr. 916).  Mrs. Garcia testified that Petitioner had two guns, a Caltech and a Glock.  (Tr. 914).  When she took the Monroe County Sheriff's Investigators to the closet where Petitioner stored his firearms, the guns were missing.  (Tr. 927).

Mrs. Garcia's brother, Jonathan Hillengas ("Hillengas"), testified that Petitioner called him around 5:30 a.m. on February 14, 2009.  (Tr. 930–932).  As a result of the conversation, Hillengas left and went to see his sister.  (Tr. 932–934).  Petitioner called Hillengas later that afternoon and said he was coming over.  (Tr. 935).  Petitioner arrived about 2:30 p.m. and dropped off a green patterned hooded fleece as well as a black gun clip (Tr. 936–940), which he asked Hillengas to hold for him.  (Tr. 942).  Hillengas later turned both items over to the police.  (Tr. 946–947).  The clip was identified as a Glock magazine containing ten unfired rounds.  (Tr. 1058–1059).  Haley identified the fleece as the one Petitioner had worn at her house.  (Tr.  703–704).

### B.  The Defense Case

The defense called no witnesses.  (Tr. 1557).

### C.  Jury Verdict and Sentence

The jury returned a verdict convicting Petitioner as charged in the indictment.  (Tr. 1737–1741).

On September 1, 2009, the trial judge dismissed the third and fourth counts of the indictment charging second-degree murder because they were, as a matter of law, subsumed within the first-degree murder counts.  (S. Tr. 2–3).[7]  The trial judge sentenced Petitioner to consecutive life terms of imprisonment without the possibility of parole on the two first-degree murder convictions.   (S. Tr. 51–55).   On the two second-degree kidnapping convictions, the trial judge sentenced Petitioner to 25-year terms of imprisonment to be served consecutively to each other and to the sentences on the first-degree murder convictions.  (S. Tr. 55–57).

### III.    The Direct Appeal

Through counsel, Petitioner pursued a direct appeal of his conviction.   The appellate brief (SR. 0170–0212) raised the following arguments for reversal:  (1) the prosecution's elicitation of testimony from Haley that Petitioner had "disposed of other people that day" violated the court's *Ventimiglia* ruling and warranted the grant of defense counsel's mistrial motion; (2) the imposition of consecutive sentences on the murder convictions was illegal; (3) the trial court abused its discretion in denying defense counsel's request for an adjournment of the trial; (4) Haley's identification testimony was erroneously admitted because the line-up fillers and Petitioner lacked sufficient resemblance to each other and therefore the line-up procedure was unduly suggestive; and (4) the buccal swab violated Petitioner's right to be free from bodily intrusions and, since it was post-arraignment, also violated his right to counsel.  The Supreme Court, Appellate Division, Fourth Department, unanimously affirmed the conviction.  *People v. Garcia*, 101 A.D.3d 1604, 1605, 959 N.Y.S.2d 571, 573 (4th Dept. 2012).  The Appellate

---

[7]    Numerals in parentheses preceded by "S. Tr." refer to the actual pages from the sentencing transcript, contained in ECF No. 11-5, the second volume of transcripts filed by Respondent.

Division held that any prejudice resulting from the alleged *Ventimiglia* violation was alleviated by the trial court's curative instruction. *Id.* at 1605. Any error in denying the mistrial motion was harmless because there was "overwhelming evidence of guilt, and there [was] no significant probability that the single statement by the witness affected the jury's verdict or that the absence of the error would have led to an acquittal." *Id.* The Appellate Division concluded that it was not an abuse of discretion to deny an adjournment where defense counsel had received notice of the trial date over five months in advance, and there was no prejudice to the defense. *Id.* The Appellate Division further determined that the trial court properly denied the motion to suppress identification evidence. *Id.*

However, the Appellate Division agreed with the defense that the trial court had erred in refusing to suppress the DNA evidence obtained from the buccal swab, explaining that the inevitable discovery doctrine did not apply in this case since "the evidence sought to be suppressed is the very evidence obtained in the illegal search [and seizure]." *Id.* at 1605–1606. Nonetheless, the Appellate Division deemed the error harmless because the evidence of Petitioner's guilt was "overwhelming," *id.* at 1606, and there was "no reasonable possibility that the erroneously admitted evidence contributed to [his] conviction." *Id.* Finally, the Appellate Division concluded that the consecutive sentences imposed for the murder convictions were illegal. *Id.* Accordingly, the Appellate Division modified the judgment by directing that the sentences on those counts run concurrently with each other. *Id.* The New York Court of Appeals denied leave to appeal. *People v. Garcia*, 20 N.Y.3d 1098 (2013).

### IV.     Post-Conviction Collateral Motions

Petitioner filed a raft of unsuccessful *pro se* applications for post-conviction relief in state court, including four motions to vacate the judgment pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10, two petitions for writs of error *coram nobis* in the Appellate Division, a petition for a writ of habeas corpus under New York Civil Practice Law and Rules Article 70, various discovery motions, a motion to create a record, and various felony complaints against the Ontario County District Attorney.  *See generally* ECF Nos. 11-2 (State Court Records, Volume I) & 11-3 (State Court Records, Volume II).

### V.     The Federal Habeas Proceeding

Petitioner commenced this habeas proceeding by filing a *pro se* petition, ECF No. 1, asserting the following grounds for relief:  the trial court was biased and partial (Ground One, ECF No. 1 at 8-14)[8]; the prosecutor committed misconduct during the grand jury proceeding and at trial (Ground Two, *id.* at 15-17); the police committed misconduct which infected the grand jury proceeding and trial (Ground Three, *id.* at 17-19); and trial counsel was ineffective (Ground Four, *id.* at 20-22).

Respondent filed a response to the petition, ECF No. 11, attaching a memorandum of law in opposition, ECF No. 11-1; two volumes of state court records, ECF Nos. 11-2 and 11-3; and two volumes of transcripts of the state court criminal proceedings, ECF Nos. 11-4 and 11-5.  Petitioner filed a reply.  ECF No. 13.

---

[8]      Unless otherwise noted, citations to pleadings filed in this action are to the page numbers automatically generated by the Court's CM/ECF system and located in the header of each page.

## DISCUSSION

### I.    Exhaustion and Procedural Default

"Before a federal court may grant habeas relief to a prisoner in state custody, the prisoner must exhaust his or her state court remedies."  *Galdamez v. Keane*, 394 F.3d 68, 72 (2d Cir. 2005) (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); 28 U.S.C. § 2254(b)(3), (c)).  In general, the exhaustion requirement is satisfied "when a petitioner has: (i) presented the federal constitutional claim asserted in the petition to the highest state court (after preserving it as required by state law in lower courts) and (ii) informed that court (and lower courts) about both the factual and legal bases for the federal claim." *Ramirez v. Att'y Gen. of State of N.Y.*, 280 F.3d 87, 94 (2d Cir. 2001).  "For exhaustion purposes, 'a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred.'" *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir.1991) (quoting *Harris v. Reed*, 489 U.S. 255, 263 n.9 (1989)).  Where "any attempt at exhaustion in the face of [a] procedural default would be futile[,]" *Reyes v. Keane*, 118 F.3d 136, 139 (2d Cir. 1997), the claim will be "deemed exhausted[,]" *id.*

Respondent argues that the judicial bias claim in Ground One is either fully unexhausted or is unexhausted but should be deemed exhausted and procedurally defaulted.  ECF No. 11-1 at 14–15.  Furthermore, Respondent contends, the claim is meritless.  *Id.* at 16–17.  Respondent asserts the procedural misconduct and police misconduct claims are procedurally defaulted because the state court relied on an adequate and independent state ground to dismiss them, that Petitioner cannot overcome the procedural default, *id.* at 17–19, and that the claims are, in any event, meritless.  *Id.*

at 19–21.   Finally, Respondent argues, the ineffective assistance claim is fully unexhausted and without merit.  *Id.* at 21–26.

Petitioner asserts in the petition that all of his claims were exhausted in his various state-court filings.  ECF No. 1 at 14, 16, 18–19, 21.  In his reply, ECF No. 13, Petitioner asserts that Respondent is unfairly blaming him for failing to exhaust and procedurally defaulting claims since he "even attempted to consolidate post-collateral non record facts with pending direct appeal," despite being thwarted by the trial court and appellate counsel.  *Id.* at 3.  To the extent Petitioner believes he should be excused from compliance with the exhaustion requirement and New York state procedural rules because he "attempted to consolidate post-collateral non record facts with pending direct appeal," he is incorrect.  It is "well settled" that the intermediate state appellate courts in New York are "limited to reviewing 'facts contained in the record and any arguments based thereon' and [they] will therefore not consider arguments 'founded upon information outside the record[.]'"  *Reed v. New York State Elec. & Gas Corp.*, 183 A.D.3d 1207, 1209, 125 N.Y.S.3d 475 (3d Dept. 2020) (quoting *Bullock v. Miller*, 145 A.D.3d 1215, 1216, 43 N.Y.S.3d 201 (3d Dept. 2016) (internal quotation marks and citation omitted in original)); *see also*, *e.g.*, *People v. Garner*, 99 A.D.2d 596, 471 N.Y.S.2d 420, 421 (3d Dept. 1984) ("[D]efendant improperly includes allegations and factual matters which were not a part of the record before County Court. . . . The matters not properly a part of the record were not considered in arriving at our decision.").

"'[I]n habeas corpus cases, potentially complex and difficult issues about the various obstacles to reaching the merits should not be allowed to obscure the fact that the underlying claims are totally without merit.'"  *Quinney v. Conway*, 784 F. Supp. 2d

247, 260 (W.D.N.Y. 2011) (alteration in original) (quoting *Boddie v. New York State Div. of Parole*, 288 F. Supp. 2d 431, 439 (S.D.N.Y. 2003); citing *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997) (stating that bypassing procedural questions to reach the merits of a habeas petition is justified in rare situations, "for example, if the [underlying issues] are easily resolvable against the habeas petitioner, whereas the procedural bar issue involved complicated issues of state law")).

Moreover, district courts now have the authority to deny a petition containing unexhausted claims on the merits.  *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").  The rationale behind 28 U.S.C. § 2254(b)(2) has been described as "spar[ing] state courts from needlessly wasting their judicial resources on addressing meritless claims solely for the sake of exhaustion."  *Keating v. New York*, 708 F. Supp. 2d 292, 299 n.11 (E.D.N.Y. 2010).  In this Circuit, the various formulations for the proper standard to be used when relying on § 2254(b)(2) share "the common thread of disposing of unexhausted claims that are unquestionably meritless."  *Id.* (collecting cases).  Because all of the claims raised in the petition are "unquestionably meritless," the Court will exercise its discretion to bypass the issues of exhaustion and procedural default.

## II.    How to Construe the Arguments in the Reply

In his reply, Petitioner asserts that the "presumption of regularity, correctiveness [sic], nor great deference to state court's determination on facts and law, cannot be attached to this writ at bar," ECF No. 1 at 4; *see also id.* at 5, because appellate counsel incorrectly framed the claims based on the line-up identification and the buccal swab and

DNA evidence.  *See id.* at 4-6.  It is not clear, however, whether Petitioner is asserting a stand-alone claim of ineffective assistance of appellate counsel or simply attempting to respond to Respondent's exhaustion, procedural default, and merits arguments.

By mentioning a state court's factual and legal determinations, Petitioner appears to be referencing the language in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214 (1996), which amended the federal habeas statute.  "AEDPA 'imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt.'" *Jones v. Murphy*, 694 F.3d 225, 234 (2d Cir. 2012) (internal quotation marks omitted in original) (quoting *Hardy v. Cross*, 565 U.S. 65, 66 (2011) (per curiam)).  "The deferential AEDPA standard of review will be triggered when the state court has both adjudicated the federal claim 'on the merits' and reduced its disposition to judgment."  *Contant v. Sabol*, 987 F. Supp. 2d 323, 349 (S.D.N.Y. 2013) (citing *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001)).  "Where the state court 'did not reach the merits' of the federal claim, however, 'federal habeas review is not subject to the deferential standard that applies under AEDPA. . . . Instead, the claim is reviewed *de novo*.'"  *Id.* (ellipsis in original) (quoting *Cone v. Bell*, 556 U.S. 449, 472 (2009)).

Here, many of Petitioner's claims apparently have not been exhausted.  Thus, there are no "adjudications on the merits" of those claims to which AEDPA's deferential standard may be applied.  In addition, in the interest of judicial efficiency, and because the outcome is the same regardless of what standard of review applies, the Court has elected to review the entire petition under a pre-AEDPA, *de novo* standard.  *See Messiah v. Duncan*, 435 F.3d 186, 197–98 (2d Cir. 2006) ("We need not . . .  determine whether

22

Messiah's claims were subject to a ruling on the merits in state court, as those claims fail under the more forgiving pre-AEDPA standards of review.").

To the extent that the reply asserts standalone claims of ineffective assistance of appellate counsel not originally raised in the petition, there is ample authority for declining to consider them.  Rule 2(c)(1) of the Rules Governing Section 2254 Cases in the United States District Courts states that a habeas petition "must . . . specify all the grounds for relief available to the petitioner."  "In light of this Rule, it has been recognized that a traverse is not the proper pleading in which to raise additional grounds for habeas relief." *Parker v. Duncan*, No. 9:03CV0759(LEK/RFT), 2007 WL 2071745, at *6 (N.D.N.Y. July 17, 2007), *aff'd*, 255 F. App'x 565 (2d Cir. 2007).  As a matter of fairness, "by raising an argument solely in a reply brief, the petitioner deprives the respondent of an opportunity to respond to the new claim."  *Gabbidon v. Lee*, No. 18CIV2248VBJCM, 2022 WL 1557272, at *7 n.9 (S.D.N.Y. Mar. 10, 2022), *report and recommendation adopted*, No. 18 CV 2248 (VB), 2022 WL 1558156 (S.D.N.Y. May 16, 2022).

The Court notes, however, that Respondent here has interpreted the petition as raising a standalone claim that the identification procedure was unduly suggestive, *see* ECF No. 11-1 at 20 n.4, which is the predicate for one of Petitioner's two complaints in the reply against appellate counsel, ECF No. 13 at 4–5.  Respondent has argued that such a claim is meritless.  *See* ECF No. 11-1 at 20 n.4.  The second predicate for Petitioner's claim of ineffective assistance of appellate counsel likewise is meritless and is readily denied.  In the interest of completeness, then, the Court will exercise its discretion to consider the merits of the allegations against appellate counsel, notwithstanding the fact they were improperly raised in the reply for the first time.

III.    **Merits of Petitioner's Claims**

A.  **Ground One of the Petition: Judicial Bias**

Petitioner complains that the trial court acted as a "[b]iased and partial judicial officer since the February 27, 2009 arraignment, and continu[ing] until June 26, 2018". ECF No. 1 at 8.  As evidence of the judge's alleged bias and partiality, Petitioner cites various rulings that were unfavorable to the defense.  *See id.* at 8–14.  As the Supreme Court has observed, "judicial rulings, routine trial administration efforts, and ordinary admonishments (whether or not legally supportable) to counsel and to witnesses" do not warrant disqualification where they "neither (1) relied upon knowledge acquired outside such proceedings nor (2) displayed deep-seated and unequivocal antagonism that would render fair judgment impossible."  *Liteky v. United States*, 510 U.S. 540, 556 (1994).

Petitioner has not shown, and cannot show on this record, that the trial judge relied on information extraneous to the criminal proceeding in making his rulings.  Nor did the trial judge's rulings "raise even a suspicion of a 'deep-seated and unequivocal antagonism that would render fair judgment impossible,'" *LoCascio v. United States*, 473 F.3d 493, 496 (2d Cir. 2007) (quoting *Liteky*, 510 U.S. at 556).  Therefore, Petitioner has failed to set forth a cognizable claim that he was denied his due process right to a fair trial  *See*, *e.g.*, *Artis v. Rock*, No. 9:12-CV-00814-JKS, 2014 WL 1584089, at *12 (N.D.N.Y. Apr. 21, 2014) (petitioner claimed that "[t]he judge proved himself to be biased" by failing to admit the videotape of the victim's interview and by declining to hold hearings on juror misconduct and ineffective assistance of counsel claims; district court held that none of the conduct came "even close to approaching the standards required to show that he was denied a fair trial"); *Mills v. Poole*, No. 1:06-CV-00842-MAT-VEB, 2014 WL 4829437, at

*6 (W.D.N.Y. Sept. 29, 2014) (stating that habeas petitioner's "claims of bias and impartiality" were "conclusory and based entirely on his disagreement with the Court's decisions" and provided "an insufficient basis for recusal").

Petitioner also contends that the trial judge, after he was elected as a Justice of New York State Supreme Court and no longer held office in Ontario County Court, nevertheless ruled in 2016 and 2017 on two of Petitioner's C.P.L. § 440.10 motions.  *See* ECF No. 1 at 13–14.  Petitioner has identified no impropriety on these facts.  To the contrary, C.P.L. § 440.10 motions are routinely heard in New York State Supreme Court even though the defendant's underlying conviction was rendered in County Court.  *See*, *e.g.*, *People v. Valenti*, 175 A.D.2d 489, 489, 572 N.Y.S.2d 766, 767 (3d Dept. 1991) (per curiam) (considering appeal of the denial by a justice of Albany County Supreme Court of defendant's C.P.L. § 440.10 motion to vacate the judgment of conviction originally rendered in Albany County Court).  Petitioner's claim of judicial bias is factually unsubstantiated and legally baseless.  Accordingly, it does not provide a basis for habeas relief.

### B.  Grounds Two and Three: Procedural Misconduct and Police Misconduct

Petitioner's claims of prosecutorial misconduct are based on the prosecutor's alleged presentation of falsified evidence created by, or perjured testimony offered by, various law enforcement officers and forensic analysts.  Therefore, the Court will discuss the claims of prosecutorial misconduct and police misconduct together.

According to Petitioner, Ontario County District Attorney R. Michael Tantillo committed "[e]gregious Prosecutorial Misconduct" which "render[ed] all Pre and trial proceedings themselves unfair and a mokery [sic]."  ECF No. 1 at 15.  Petitioner asserts

that (1) the prosecutor presented evidence of the line-up identification procedure despite being "fully aware that said line-up was unduly suggestive," *id.*; (2) the prosecutor presented perjured testimony from Ontario County Sheriff's Deputies Butler and Martin and trace forensic analyst Atrouni related to the tire track cast, *id.*; (3) the prosecutor allowed Deputy Butler to testify about the lists made by the Glatzes, even though Deputy McNeill had conducted the fingerprint analysis, *id.* at 15–16; (4) the prosecutor allowed Haley and other witnesses to testify about Mrs. Glatz's preparation of a list of her family members for Petitioner to kill, even though Mrs. Glatz's fingerprints were not recovered from the list, *id.* at 16, 18; and (5) the prosecutor presented evidence of the list made by Mr. Glatz, despite knowing that it was planted in the trunk of Petitioner's car by Ontario County Sheriff's Investigator Brad Falkey in the presence of Investigator Peglow and Deputy Sheriff McNeill, *id.* at 16, 18.   These instances of prosecutorial and police misconduct allegedly occurred during both the grand jury proceeding and at trial.  *See id.*

### 1.  The Grand Jury Claims Are Not Cognizable on Federal Habeas Review

In *Lopez v. Riley*, 865 F.2d 30 (2d Cir. 1989), the Second Circuit considered whether claims of error in a state grand jury proceeding are cognizable on federal habeas review.  The Circuit looked to *United States v. Mechanik*, 475 U.S. 66 (1986), which involved a constitutional attack on a federal grand jury proceeding.  In rejecting the defendants' claim, the Supreme Court explained that

> the petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt.

*Id.* at 70.  "Based on that proposition, the Second Circuit reasoned that '[i]f federal grand jury rights are not cognizable on direct appeal where rendered harmless by a petit jury, similar claims concerning a state grand jury proceeding are *a fortiori* foreclosed in a collateral attack brought in federal court.'"  *Jansen v. Monroe County*, 430 F. Supp. 2d 127, 130 (W.D.N.Y. 2006) (quoting *Lopez*, 865 F.2d at 32 (holding that habeas petitioner's "claims of impropriety before the grand jury in this case concern[ing] the sufficiency of the evidence, a failure to develop exculpatory evidence by the prosecutor, the presentation of prejudicial evidence and error in explaining the law" . . . were "cured in the trial before the petit jury, which convicted")).  "Thus, the guilty verdict at [Petitioner]'s [jury] trial precludes habeas review of all of [his] claims that relate to the grand jury proceeding." *Id.*; *see also Klosin v. Conway*, 501 F. Supp. 2d 429, 436 (W.D.N.Y. 2007) (holding that habeas petitioner's claims of error in the grand jury proceeding were not cognizable on federal habeas review because he was convicted following a trial before a petit jury).

### 2.  The Trial Claims Are Plainly Meritless

#### a.  Elicitation of Testimony Regarding the Identification Procedure

Petitioner maintains that the prosecutor committed misconduct by presenting testimony concerning the line-up identification procedure at which Haley identified Petitioner.  Since the prosecutor was present at the line-up, he was "fully aware" it was "unduly suggestive" and should not have introduced Haley's identification testimony at trial.  ECF No. 1 at 15.  Petitioner ignores the fact that, after a hearing, the trial court ruled that the lineup was not unduly suggestive.  (*See* Decision Den. Suppression Mot., SR: 0014-0016 (findings of fact), SR. 0023-0025 (conclusions of law)).  And that ruling was upheld by the Appellate Division on direct appeal, which found that Petitioner's

"contention that the [trial] court erred in refusing to suppress the identification evidence is without merit inasmuch as the lineup was not unduly suggestive."  (SR: 0484).   The prosecutor cannot have committed misconduct by introducing testimony that explicitly had been held to be admissible at trial.  This claim is frivolous and must be denied.

### b.  The Tire Track in the Driveway

According to Petitioner, the Ontario County Sheriff's Office is the only one out of 62 counties in New York State which allegedly—and improperly—"allows crime scene unit investigator/gathers [sic] of evidence to hold office as property clerk office custodians, where evidence is secured, before physical evidence is sent" for forensic analysis.  ECF No. 1 at 18.  Therefore, Petitioner claims, the prosecutor was "aware" that People's Exhibit 25, the cast of the impression that one of the tires from his car left in the Glatzes's driveway, must have been "created at the Ontario County Sheriff office property Clerk's Office [sic], by CSI [sic] unit personnel Deputy Butler and Martin."  ECF No. 1 at 15, ¶ 2.  Nevertheless, the prosecutor introduced contradictory testimony that it was created at the crime scene.  *See id.* (citing Tr. 849:23–850:13 (Deputy Taylor stated that he could not testify as to who originally found the print; there were a number of law enforcement officers present in addition to himself), Tr. 1166:7–1169:11 (Deputy Butler assisted Deputy Taylor with the cast of the tire impression located in the driveway, and then turned it over to Deputy Woehr, who was collecting evidence); Tr. 1231:6–1232:21 (Deputy McNeill took photographs of the tires on Petitioner's car at the crime scene), Tr. 1239:7–8 (the prosecutor introduced four photographs of the tires as People's Exhibits 65, 66, 67, and 68), Tr.1471:11–1472:14 (Trace evidence analyst Atrouni testified that she received the tire cast and a computer disk that contained the four photos of the tires admitted as

People's Exhibits 65, 66, 67, and 68, as well as three other photos of visible impressions in the driveway; she determined that two of the three other photos were unusable and the third was a different tire than the questioned tire in this case)).  Petitioner claims that his hypothesis about the mass perjury is confirmed by the presence of tire tracks in the Glatzes' driveway that did not match the tires on Petitioner's car.

Petitioner's claim that the prosecutor and numerous witnesses conspired to fabricate testimony and evidence concerning the tire track from Petitioner's snow tire is purely fanciful.  It is entirely unsupported by any facts—only Petitioner's own speculation and conjecture.   "Federal district courts cannot grant habeas relief based upon unsubstantiated surmise, opinion or speculation." *Mills v. Lempke*, No. 11-CV-0440 MAT, 2013 WL 435477, at *23 (W.D.N.Y. Feb. 4, 2013) (citing *Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (federal courts may not grant "habeas relief on the basis of little more than speculation with slight support")).

Moreover, the presence of tire tracks that did not match Petitioner's vehicle in the Glatzes' driveway was hardly surprising.  Presumably, the Glatzes' own vehicles had left tire tracks in the driveway.  In addition, Haley and Danny's father pulled his truck into the driveway when he came to pick them up after the shooting.  This claim also is frivolous and must be denied.

### c.  The Lack of Fingerprints on the Notepaper

Petitioner claims that the prosecutor elicited false testimony from Haley she saw her mother, at Petitioner's direction, making a list of family members to be targeted if he was not paid $25,000.  Petitioner reasons that because Mrs. Glatz's fingerprints were not

recovered from the note paper (People's Exhibits 78 and 99) found in the living room, *see* ECF No. 1 at 16, Haley must have perjured herself.

"A witness commits perjury if he [or she] gives false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory. *United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001). "Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury." *Id.* A threshold demonstration of perjury, standing alone, does not warrant a new trial. *Id.* The reviewing court instead must evaluate on the materiality of the perjured testimony to the jury's verdict and the extent to which the prosecutor was aware that the witness testified falsely. *Id.* Petitioner has not come close to making the required threshold showing that Haley testified falsely regarding a material issue.

Deputy Butler testified that on People's Exhibit 78, he raised three chemical lifts—two of which matched Petitioner; the third belonged to Haley. (Tr. 1215). On People's Exhibit 99, Deputy Butler raised seven lifts, five of which matched Petitioner. The last two were Mr. Glatz's. (*Id.*). However, the fact that Deputy Butler was unable to lift any fingerprints belonging to Mrs. Glatz does not mean she did not touch the paper. For example, Haley testified that she gathered up phones and computers from around the house at Petitioner's direction but Deputy Butler was unable to find any prints at all on the three phones and the laptop found on the stairs. (Tr. 1219). Deputy Butler also testified that, even if fingerprints are able to be lifted, it is not unusual for them to be of no value for comparison purposes. (Tr. 1165). Thus, the absence of Mrs. Glatz's fingerprints on

two pieces of paper was hardly noteworthy.  It does not mean that Haley testified falsely, or even inaccurately.

Even if Haley's testimony was incorrect, the issue of whether or not Mrs. Glatz made a list of family members at Petitioner's direction was not material to the jury's verdict.  That is to say, even if the jury had not heard Haley's testimony about the list made by Mrs. Glatz, there was no conceivable possibility that the jury would have reached a different verdict.  Because Petitioner has not demonstrated that any perjury was elicited in regard to the handwritten lists by the Glatzes, he has not shown any misconduct by the prosecutor in questioning the witnesses or the police in recovering and testing the evidence.

### d.  The Letter Found in the Trunk of Petitioner's Car

Petitioner asserts that the prosecutor knew that People's Exhibits 78 and 99, the two sheets of Quail Summit notepaper which were found tucked into a composition notebook his car, actually were planted there by Investigator Brad Falkey, Investigator Peglow, and Deputy McNeill during their execution of the search warrant for his car.  ECF No. 1 at 16, 18.  He asserts that he proved this alleged planting of evidence "via documental and pictorial proof" in the 2010 and 2013 C.P.L. § 440.10 motions, the 2016 and 2017 *coram nobis* petitions, and the 2018 "C.P.L. 440.30(5) [sic] and Judicial Law § 2-b petition."  *Id.* 18–19.  However, in none of his filings did Petitioner establish that any evidence was planted in his car.

To the contrary, Petitioner's 2010 C.P.L. § 440.10 motion reveals he is only speculating about who was responsible.  *See* SR.0559 ("Who would take those sheets of extortion notes, especially when the individuals being extorted are deceased? 31.

[P]ossible scenerio [sic] – OCSO Inv. B. Falkey – took them from the·crime scene·and was eager to be at fleet bay that night and planeted [sic] them there?"); *see also* SR.0561 ("[W]ould it fair to say that two sheets came from a note pad located on top·of living room table? did OCSO Inv b. [sic] Falkey take them from the pad and these two sheets mysterially [sic] appeared in def auto 7 hrs after?").

Petitioner's only "proof" that Investigator Falkey planted the notepaper is that the police witnesses described the black and white composition notebook as spiral bound, but "[w]e all know – since our elementary school years and thru-out that – black composition notebooks are not spirally bound." (SR.1395–1396). Even assuming that the police witnesses inaccurately described the black and white composition notebook as spiral bound instead of having a glued spine, Petitioner does not explain how that purported misdescription leads to the conclusion that Investigator Falkey placed the Quail Summit notepaper in the composition notebook. This claim does not make any logical sense and is dismissed as frivolous.

## C. Ground Four:  Ineffective Assistance of Trial Counsel

### 1. Legal Standard

To succeed on a claim of ineffective assistance under *Strickland v. Washington*, 466 U.S. 668 (1984), the petitioner must establish that counsel's performance "fell below an objective standard of reasonableness[,]" *id.* at 688, and that the petitioner suffered prejudice as a result, *see id.* at 694. Prejudice, for *Strickland* purposes, is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "The habeas petitioner bears the burden of establishing both deficient performance and prejudice." *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (citation omitted).

## 2. Trial Counsel's Alleged Errors

### a. Failure to Call Negative Identification Witnesses

Petitioner faults trial counsel for declining to call "the three (3) exculpatory line-up viewing witnesses" who "saw and spoke to the perpetrator earlier that morning, across the street from the Ontario County crime scene."   ECF No. 1 at 19.   According to Petitioner, all three individuals identified a filler at the line-up identification procedure instead of Petitioner.  *Id.*  In support of this claim, Petitioner cites portions of trial counsel's cross-examination of Deputy Schaeffer at the suppression hearing.  Deputy Schaeffer testified that he drove Haley to the Public Safety Building and was present for the line-up that she reviewed.  Deputy Schaeffer also indicated that three other people were there to view a line-up but he did not recall their names; a different officer had transported them to the Public Safety Building.  (H. Tr. 67–68).[9]  There was no testimony at the suppression hearing about who these individuals were or what occurred during the line-ups that they viewed.

Based on information the Court has gleaned by reviewing the state court records, the three other individuals besides Haley who viewed the line-up were members of the DeRoos family (SR. 0778, SR. 0780).[10]   The only information about what any of the DeRoos family members saw or heard came from Yvonne Snyder ("Snyder"), whose phone Haley used to call her father.  Snyder, in her statement to the police (SR.0772),

---

[9]      Numerals in parentheses preceded by "H. Tr." refer to pages from the suppression hearing, which is contained in ECF 11-4, the first volume of transcripts filed by Respondent.
[10]      These pages are in the letter dated March 18, 2009, from then-Monroe County Assistant District Attorney Douglas A. Randall to Monroe County Assistant Public Defender Jill Paperno, who presumably was representing Petitioner at that time, transmitting the discoverable contents of the prosecution's file in connection with the Monroe County homicides.

stated that her across-the-street neighbor, Wanda DeRoos, called her at about 8:20 a.m. to say that a strange man—presumably Petitioner—had come to her door about 7 a.m.

"The decision not to call a particular witness is typically a question of trial strategy that appellate courts are ill-suited to second-guess." *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998) (per curiam).  "Thus, 'counsel's decision as to "whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation."'" *Greiner*, 417 F.3d at 323 (quoting *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000) (further quotation omitted)).  A petitioner "does not show that he was prejudiced by trial counsel's alleged deficient performance merely by asserting that certain witnesses might have supplied relevant testimony; rather, he must state exactly what testimony they would have supplied and how such testimony would have changed the result." *Carr v. Senkowski*, No. 01-CV-689, 2007 WL 3124624, at *20 (W.D.N.Y. Oct. 23, 2007) (citing, *inter alia*, *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)).  "[I]n order for the [petitioner] to demonstrate the requisite *Strickland* prejudice, the [petitioner] must show not only that this testimony would have been favorable, but also that the witness would have testified at trial." *Id.* at *22 (citing *Alexander*, 775 F.2d at 602).

Petitioner has not demonstrated that trial counsel made a professionally unreasonable decision not to call the DeRoos family members as witnesses.  First of all, trial counsel reasonably could have inferred that since they were close neighbors of the victims, they might not be inclined to testify for the defense.  The Second Circuit has noted that "deference" to defense counsel's strategic decision not to call a witness is

"particularly apt" where the witness is "unfriendly" and the attorney "has precious little means of determining how the witness might testify." *Greiner*, 417 F.3d at 323.

Secondly, even if these individuals would have been willing to testify at trial, there is no guarantee they would have failed to identify him a second time. Indeed, courts have remarked on the inherent suggestiveness of in-court identifications and have expressed due process concerns with allowing *prosecution* witnesses, who have not identified a defendant during a pre-trial procedure, to make an in-court identification of the defendant at trial. *See United States v. Archibald*, 734 F.2d 938, 941–42 (2d Cir.), *modified*, 756 F.2d 223 (2d Cir. 1984) ("Our concern with suggestive in-court identification procedures has been noted in a number of cases. . . . '[T]here is always the question how far in-court identification is affected by the witness' observing the defendant at the counsel table.'") (quoting *United States ex rel. Phipps v. Follette*, 428 F.2d 912, 915 (2d Cir. 1970)). Petitioner ignores the substantial risk that these witnesses would have identified the man they spoke to on the morning of the murders as the person sitting at defense counsel's table, with several law enforcement officers seated behind him.   And if these witnesses had positively identified Petitioner at trial, defense counsel likely would not have been able to have their testimony stricken. *Cf. Flowers v. Ercole*, No. 06 CV 6550 NG/KAM, 2008 WL 2789771, at *11 (E.D.N.Y. June 23, 2008) ("[T]o the extent petitioner's counsel belatedly objected to [a witness]'s in-court identification on the basis that there was no prior identification, an in-court identification of a defendant by an eye-witness can be admissible even though the witness never participated in any pretrial identification proceeding. . . .")).

In any event, even if trial counsel had called these individuals and they failed to make a positive in-court identification, it would not have dented the probative value of Haley's consistent and unwavering identification of Petitioner as the perpetrator. "[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). In particular, "[w]ith regard to the second factor, the witness' degree of attention, victims of crimes tend to closely observe their assailants out of fear for their safety." *Brazeau v. Zon*, No. 04-CV-031, 2007 WL 2903617, at *41 (W.D.N.Y. Oct. 1, 2007) (citing, *inter alia*, *United States v. Wong*, 40 F.3d at 1360 (finding witness' degree of attention to be "very high" while she feared for her own and her husband's safety)).

Haley was a victim of a crime that spanned several hours, during which time she—along with her mother, stepfather, and brother—were in constant fear for their lives. Haley interacted directly with Petitioner on multiple occasions, such as when he ordered her to bring him all the phones and computer devices in the house, when he asked her to make him toast and give him something to drink, and when he engaged her and Danny in a conversation about whether or not he should kill them. (Tr. 635–637, 647–649). In addition, before Petitioner left the house, he "kept on coming back into [Danny's] room and saying, 'How long?,'" to make sure Haley and Danny knew that he had ordered them to wait 20 minutes before leaving. (Tr. 639–640).

Less than eight hours after the incident, Haley where she viewed a physical line-up of six men.  (Tr. 663–665).  She testified that the police officers told her that each person in the lineup would step forward, make a full rotation, and step back, and that she could ask for "repeats" if necessary.  (Tr. 694).  Haley immediately identified Petitioner, who was holding number "four."  (Tr. 664–665).  She testified she did not need anyone to step forward because she "just knew who he was when [she] looked at him" and recognized him "right away" (Tr. 697) as the person who had been "in [her] house hours ago."  (Tr. 698–699).  Thus, the factors relevant under *Neil v. Biggers* weigh strongly in favor of finding that Haley's identification was independently reliable.

On the other hand, the only information in the state court records about the uncalled witnesses is that one, Wanda DeRoos, briefly spoke to Petitioner.  The inability of the DeRooses to select Petitioner out of a line-up containing five other individuals who were selected precisely because of their similarities in appearance to Petitioner is not surprising.  Petitioner has failed to establish that trial counsel's strategic decision not to call the DeRooses was objectively unreasonable, or that it had any conceivable effect on the verdict.

### b.  Failure to Present and Failure to Exclude Cell Tower Evidence

Petitioner asserts contradictory claims regarding the cell tower evidence offered by the prosecution at trial.  On the one hand, he attacks trial counsel for not focusing on the evidence that his cell phone was "pinging" off a cell tower in Naples, situated 20 miles away from Canandaigua.  According to Petitioner, this meant he could not have been in Canandaigua at the time of the murders.  Petitioner has not come forward with any information about the range of the cell towers referenced in this case and thus he has

offered nothing but speculation in support of this claim.  For this reason, he cannot show that trial counsel had a colorable argument to make or that the failure to do so had any effect on the verdict.  *Mills v. Lempke*, No. 11-CV-0440 MAT, 2013 WL 435477, at *23 (W.D.N.Y. Feb. 4, 2013) ("Federal district courts cannot grant habeas relief based upon unsubstantiated surmise, opinion or speculation.") (citing *Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (federal courts may not grant "habeas relief on the basis of little more than speculation with slight support")).

On the other hand, Petitioner assails trial counsel for failing to exclude the evidence gleaned from the cell towers as the fruit of an unreasonable search.  *See* ECF No. 1 at 19-20.  However, trial counsel did not have a colorable argument to make in support of a motion to suppress.  At the time of trial, courts in New York had held—and have continued to hold—that "pinging" a defendant's cell phone to obtain real-time cell-site location does not constitute a search within the meaning of the Fourth Amendment. *People v. Moorer*, 39 Misc. 3d 603, 615, 959 N.Y.S.2d 868, 879 (N.Y. Co. Ct. 2013) ("[T]his Court concludes, similarly, that a subscriber's signal (the transmission of it), necessary to make a call from his cell phone, does not entitle the subscriber to a reasonable expectation of privacy. . . . [D]efendant's Fourth Amendment rights were not implicated or violated by the pinging of defendant's phone."); *accord People v. Watkins*, 125 A.D.3d 1364, 1365, 3 N.Y.S.3d 236, 238 (4th Dept. 2015) ("[T]he court properly refused to suppress evidence obtained by the police without a warrant from defendant's cell phone service provider.  The provider disclosed information to the police concerning defendant's location through the use of a technique commonly known as 'pinging'."); *People v. Campos*, 50 Misc. 3d 1216(A), 31 N.Y.S.3d 922, 2015 WL 10008883, at *2

(N.Y. Sup. Ct. 2015) (holding that "pinging" defendant's cell phone was not a search or seizure and did not implicate the Fourth Amendment because he had no reasonable expectation of privacy concerning his whereabouts when he is out in public), *aff'd sub nom. People v. Davis*, 184 A.D.3d 525, 127 N.Y.S.3d 27 (N.Y. 2020).  The failure to make an argument that had little to no chance of success does not show that trial counsel was professionally unreasonable.  "A defense attorney cannot be deemed ineffective for failing to pursue an unmeritorious defense or application."  *Cochran v. Griffin*, No. 918CV0175LEKTWD, 2021 WL 1223848, at *9 (N.D.N.Y. Mar. 31, 2021) (citing *United States v. Kirsh*, 54 F.3d 1062, 1071 (2d Cir. 1995) ("[T]he failure to make a meritless argument does not rise to the level of ineffective assistance.")); *see also*, *e.g.*, *Narvaez v. United States*, No. 97 CIV. 8745 (SS), 1998 WL 255429, at *3 (S.D.N.Y. May 19, 1998) ("[Defense counsel]'s failure to make this new argument does not amount to ineffective assistance, because such an argument would have been untenable.").  Nor can Petitioner demonstrate a reasonable probability that the motion would have succeeded, let alone resulted in a more favorable verdict at trial.

### c.  Failure to Present Target Practice Evidence

Petitioner contends that trial counsel was ineffective for failing to present evidence that he had practiced target shooting in Naples "regularly and weekly," ECF No. 1 at 19, for the eight years prior to the murders, apparently to explain why his cell phone was "pinging" off a cell tower in Naples on the day in question.  Petitioner has not come forward with any information to corroborate his own self-serving statements that he had a pattern or practice of engaging in target-shooting in Naples or that he was doing such target-shooting on the day of the murders.  Even if he had, trial counsel in all likelihood would

not have been permitted to introduce that evidence. *See*, *e.g.*, *People v. Simmons*, 39 A.D.3d 235, 236, 833 N.Y.S.2d 437, 438 (1st Dept. 2007) (holding that the trial court properly precluded defendant's uncle from testifying that, in the month preceding the robbery, defendant generally came directly home every evening after work and remained there; explaining that this "was not admissible as habit evidence, because there was no showing of such a repetitive pattern as to be predictive of defendant's conduct"). In any event, assuming trial counsel had been able to inform the jury that Petitioner practiced target shooting on a weekly basis in Naples, it would not have undermined the overwhelming evidence establishing that Petitioner was not at target practice on February 14, 2009, but instead was at the Glatzes' home murdering Mr. and Mrs. Glatz. Therefore, Petitioner has not demonstrated that the omission of this evidence had any effect whatsoever on the jury's verdict.

### d. Failure to Exclude References to the Monroe County Homicides

Petitioner asserts that trial counsel was ineffective in failing to "object with specification that the Monroe County case had no relevance in Ontario [C]ounty, and all testimonies surrounding the Monroe County case from 2/14/09 5 am – 2:30 p.m. and 3 pm – 8 pm needed exclusion." ECF No. 1 at 20. As noted above, trial counsel did request that the prosecutor be precluded from mentioning anything about the Monroe County homicides, arguing that such evidence would unduly prejudice the defense. The trial court rejected a blanket preclusion but limited the prosecutor to referring to crimes committed using a firearm in Monroe County.

Moreover, Petitioner is incorrect that the Monroe County murders had "no relevance" to the ones he committed in Ontario County. Under New York law, "[e]vidence

of prior bad acts or uncharged crimes may be admitted when it falls within the list of recognized *Molineux* exceptions, completes the narrative of the charged crimes, provides necessary background information or is otherwise 'relevant to some issue other than the defendant's criminal disposition' and its prejudicial effect is outweighed by its probative value[.]" *People v. Wells*, 141 A.D.3d 1013, 1019, 35 N.Y.S.3d 795, 802 (3d Dept. 2016) (quoting *People v. Allweiss*, 48 N.Y.2d 40, 47 (1979)).   The "commonly-recognized" *Molineux* exceptions "are: '(1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; [and] (5) the identity of the [defendant][.]'" *People v. Mountzouros*, 206 A.D.3d 1706, 1707, 169 N.Y.S.3d 764, 766 (4th Dept. 2022) (quoting *Molineux*, 168 N.Y. at 293).

The evidence that Petitioner had murdered a former coworker who had made a complaint against him that led to his firing was clearly relevant to the murders committed just hours later, of Mrs. Glatz—a former coworker who had made a complaint against him that led to his firing—and her husband.  For one thing, the earlier murders tended to show motive and identity, two recognized *Molineux* exceptions.  Since "[a]ll of the initial work in this case that was done to identify the Defendant as the shooter in Ontario County was performed by Monroe County police officers[,]" the evidence of the Monroe County homicides was inextricably intertwined with the evidence that the jury would be hearing regarding the Ontario County homicides, provided necessary background information, and completed the narrative of the Ontario County crimes.  (*See* Tr. 56–60).  As the prosecution argued, if the jury was not provided at least some information as to why the Monroe County Sheriff's Department and the Rochester Police Department were involved

in Petitioner's case, it would lead to confusion, speculation, and unwarranted inferences among the jurors.  (Tr. 59–60).

As trial counsel did not have a winning argument to make on relevance, he made the strongest argument he could make under the circumstances—that the prejudicial effect of the Monroe County homicides outweighed by its probative value.  The trial court agreed to a certain extent with trial counsel's argument, since the prosecutor only was allowed to mention that the Monroe County crimes involved the use of a firearm; the prosecutor was not permitted to state that the crimes involved two fatal shootings and one nonfatal shooting.  Notably, Petitioner does not explain what trial counsel should have argued instead or why it would have persuaded the trial court to rule differently.  For this reason, Petitioner cannot show that trial counsel performed unreasonably in light of prevailing professional norms or that there was a reasonable probability of a more favorable ruling had counsel objected "with specification."

### e.  Failure to Assist Petitioner in Filing Post-Conviction Motions

Petitioner complains that since the trial, he has been writing to trial counsel, David Morabito, Esq., and inquiring as to whether trial counsel was "aware" of the alleged "manipulation, manufacturing or planting of material evidence used by the Ontario County District Attorney in 2009," but trial counsel has never responded to him.  ECF No. 1 at 20.

Based on the allegations in the petition, trial counsel only represented Petitioner at trial and sentencing; he did not represent Petitioner in any post-conviction proceedings, and he is not representing Petitioner currently.  *See* ECF No. 1 at 22-23.  It is well-settled that "[t]here is no right to counsel in postconviction proceedings[.]"  *Garza v. Idaho*, 139 S. Ct. 738, 749 (2019) (citing *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987)).

Since there is no existing attorney-client relationship between them, Petitioner has not demonstrated that trial counsel breached any ethical obligation that would be owed by an attorney to his client.   In any event, even where an attorney-client relationship exists, the attorney's breach of an ethical canon or duty imposed by state law, standing alone, is insufficient to warrant habeas relief.   *See Nix v. Whiteside*, 475 U.S. 157, 165 (1986) ("Under the *Strickland* standard, breach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel."); *see also Douglas v. Hollins*, No. 00 CIV. 7928 (MBM), 2004 WL 187130, at *4 n.2 (S.D.N.Y. Jan. 29, 2004) ("Any ethical violations by counsel may be relevant when determining whether his representation violated [the petitioner]'s Sixth Amendment rights, but they do not constitute an independent basis for habeas relief under § 2254.") (citing 28 U.S.C. § 2254(a) (precondition to relief under 28 U.S.C. § 2254 is that the petitioner is held "in custody in violation of the Constitution or laws or treaties of the United States")); *Johnson v. Cain*, No. CV 14-2676, 2019 WL 4921933, at *22 (E.D. La. Sept. 9, 2019), *report and recommendation adopted*, No. CV 14-2676, 2019 WL 4918121 (E.D. La. Oct. 4, 2019) ("Even if state ethics law was implicated or violated, this Court's federal habeas corpus review does not extend to alleged state-law ethics transgressions.") (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982) (mere violation of state law did not entitle state prisoner to habeas relief)); *Adanandus v. Johnson*, 947 F. Supp. 1021, 1055 (W.D. Tex. 1996) ("Assuming *arguendo* that petitioner's trial counsel breached some unspecified ethical standard in the course of advising petitioner of counsel's candidacy for the U.S. Attorney position, that breach does not establish a *per se* violation of petitioner's Sixth Amendment right to effective assistance.").   Petitioner's complaints about his former attorney's lack of

responsiveness to his letters do not amount to a violation of state law, much less an error of federal constitutional magnitude.

### D.  Ineffective Assistance of Appellate Counsel

#### 1.  Legal Standard

*Strickland*'s two-pronged test applies to ineffectiveness claims in the appellate context.  *Aparicio v. Artuz*, 269 F.3d 78, 95 (2d Cir. 2001).  Because "[c]ounsel is not obliged to advance every nonfrivolous argument that could be made," the mere omission of a "nonfrivolous argument" does not establish deficient performance.  *Id*.  "To establish prejudice in the appellate context, a petitioner must show that, had his claim been raised on appeal, there is a reasonable probability that it would have succeeded before the state's highest court."  *Lynch v. Dolce*, 789 F.3d 303, 311 (2d Cir. 2015).  The Supreme Court has explained that prejudice "requires a 'substantial,' not just 'conceivable,' likelihood of a different result."  *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (quotation omitted).

#### 2.  Appellate Counsel's Alleged Errors

##### a.  Failure to Argue that the Admission of the DNA Evidence Was Harmful Error

As noted above, the Appellate Division agreed with appellate counsel that the DNA evidence was improperly admitted because the buccal swab was obtained in violation of Petitioner's rights.  Petitioner claims that appellate counsel failed to explain how the DNA evidence "had an enormous impact upon the triers-of-fact and the court itself" and thus could not have been harmless error.  ECF No. 13 at 5.  The Appellate Division, after reviewing the record, concluded that the other properly admitted evidence supplied overwhelming evidence of Petitioner's guilt and therefore the admission of the DNA

evidence was harmless. Petitioner does not indicate what points appellate counsel should have made that would have convinced the Appellate Division otherwise. Thus, Petitioner's conclusory assertion that there would have been a different result on appeal is based on pure speculation. This is insufficient to demonstrate prejudice as of appellate counsel's performance. *See*, *e.g.*, *Mills v. Lempke*, No. 11-CV-0440 MAT, 2013 WL 435477, at *19 (W.D.N.Y. Feb. 4, 2013) ("Mills' assertions of prejudice [from trial counsel's failure to call a witness] are based purely upon his own self-serving speculation.").

Petitioner also claims that appellate counsel erroneously failed to argue that the Appellate Division should not have employed harmless error analysis because the Supreme Court and the Second Circuit have never declared that "illegally obtained DNA evidence used at trial is subject to the harmless error analysis, especially when obtained after the right to defense counsel has attached. . . ." ECF No. 13 at 5-6. Petitioner cites no authority for the proposition that the erroneous admission of evidence is *not* subject to harmless error analysis, and this Court has found none. To the contrary, the Supreme Court has found the erroneous introduction of evidence—even in violation of a defendant's constitutional rights—to be "subject to harmless-error analysis under [its] cases." *Neder v. United States*, 527 U.S. 1, 18 (1999) (citing *Arizona v. Fulminante*, 499 U.S. 279 (1991) (erroneous admission of evidence in violation of the Fifth Amendment's guarantee against self-incrimination); *Delaware v. Van Arsdall*, 475 U.S. 673 (1986) (erroneous exclusion of evidence in violation of the right to confront witnesses guaranteed by the Sixth Amendment)). Petitioner therefore has not shown that appellate counsel omitted a winning argument, or that his appeal would have turned out differently had appellate counsel urged the inapplicability of harmless error review.

### b. Failure to Argue that Petitioner's Wedding Ring Made the Line-Up Unduly Suggestive

Petitioner contends that appellate counsel should have argued that the line-up was unduly suggestive because he was the only individual wearing a gold and diamond wedding ring.  According to Petitioner, the fact that he was the only participant wearing a ring was the sole reason Haley selected him out of the line-up.

A defendant is not entitled to a lineup in which the fillers are "nearly identical to him." *People v. Chipp*, 75 N.Y.2d 327, 336 (1990).  That said, a lineup may be found unduly suggestive "when only the defendant matches a key aspect of the description of the perpetrator provided by a witness or witnesses[.]" *People v. Kenley*, 87 A.D.3d 518, 518, 928 N.Y.S.2d 705, 706 (1st Dept. 2011); *see*, *e.g.*, *People v. Johnson*, 79 A.D.2d 617, 618, 433 N.Y.S.2d 477, 479 (2d Dept. 1980) ("Exhibiting defendant as the only subject clad in a plaid jacket, where a plaid jacket had figured prominently in the witness' description of the perpetrator, was without question unnecessarily suggestive.").

During her statement to Investigator Jacqueline Falkey at about 3 p.m. on February 14, 2009, Haley noted that the shooter had been wearing a gold and diamond ring. However, the record does not reflect, and Petitioner has not demonstrated, that the gold and diamond wedding band was a "key aspect" of Haley's description of the perpetrator or her subsequent identification of Petitioner at the line-up.   Thus, Petitioner has not shown that appellate counsel performed deficiently by omitting a stronger argument in favor of one that was significantly weaker

Likewise, Petitioner has not shown that if appellate counsel had mentioned the wedding ring in his argument setting forth the multiple reasons why the line-up should be found unduly suggestive, the Appellate Division would have ruled differently.  Therefore,

he has not demonstrated prejudice as a result of appellate counsel's omission. Even if the Appellate Division had agreed that the line-up was unduly suggestive because Petitioner was the only participant wearing a ring, that would not necessarily have resulted in reversal of the conviction—Petitioner would have had to show the error was harmful. *See People v. Owens*, 74 N.Y.2d 677, 678 (1989) (applying harmless error to out-of-court identification testimony obtained as a result of an unduly suggestive line-up procedure). As discussed above, Haley's in-court identification had independent reliability. Even if the lineup was unduly suggestive, her in-court identification was properly admitted. *See Frazier v. New York*, 187 F. Supp. 2d 102, 111 (S.D.N.Y. 2002) (holding that despite the impermissibly suggestive nature of the lineup, the admission of the witness' in-court identification was not error because there was a sufficient basis for the trial court to determine that the identification had independent reliability under the *Neil v. Biggers* factors). Since there was other overwhelming evidence of Petitioner's guilt, including Haley's proper in-court identification of Petitioner, the admission of testimony concerning the pre-trial line-up procedure must be deemed harmless beyond a reasonable doubt. *See Owens*, 74 N.Y.2d at 678 ("Notwithstanding the suggestiveness of the lineup, however, the error in receiving the tainted lineup identification [from one eyewitness] must be deemed harmless beyond a reasonable doubt when considered in light of the overwhelming evidence of defendant's guilt, which included the properly admitted in-court identifications by the two eyewitnesses."). In short, the outcome of his direct appeal would have been the same, even if appellate counsel had argued that the gold and diamond ring made the line-up procedure unduly suggestive. Petitioner therefore has not

demonstrated he was prejudiced by the manner in which appellate counsel argued the identification issue.

**CONCLUSION**

For the foregoing reasons, the request for a writ of habeas corpus is denied, and the petition, ECF No. 1, is dismissed.  Because Petitioner has failed to make a substantial showing of the denial of a constitutional right, *see* 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability. The Clerk of Court is directed to close this case.

IT IS SO ORDERED.

DATED:      February 17, 2023
            Rochester, New York

                                                CHARLES J. SIRAGUSA
                                                United States District Judge